Wolff & Samson PC
One Boland Drive
West Orange, NJ 07052
(973) 325-1500
Attorneys for Plaintiff
Bergen County Improvement Authority

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BERGEN COUNTY IMPROVEMENT AUTHORITY, <br><br> Plaintiff, <br><br> vs. <br><br> BERGEN REGIONAL MEDICAL CENTER, L.P., SOLOMON HEALTH GROUP, LLC , SOLOMON HEALTHCARE GROUP, LLC, GLOBAL EMPLOYEE BENEFITS MANAGEMENT, INC., ICARE MANAGEMENT, LLC, BERGEN REGIONAL ANESTHESIOLOGY GROUP, PA, BERGEN REGIONAL MEDICAL CENTER RADIOLOGY ASSOCIATES, PA., LIFE SOURCE SERVICES, L.P., INTERNATIONAL INFORMATION TECHNOLOGIES, LP, CURRENT ELEVATOR TECHNOLOGY, INC, JOSEPH GLASKI, HERMAN LINDENBAUM, DAVID SEBBAG, UNITED STATES ELEVATOR, INC., EDWARD H. HYNES, ELNATAN RUDOLPH, JOHN DOES 1-100, and ABC COMPANIES 1-100, <br><br> Defendants. | Civil Action No. 2:12-cv-00768-DMC-MF <br><br><br> **SECOND AMENDED COMPLAINT** |

Plaintiff Bergen County Improvement Authority ("BCIA"), by and through its attorneys, Wolff & Samson PC, by way of Second Amended Complaint against Defendants, hereby alleges as follows:

## INTRODUCTION

1.     As a governmental authority charged with the responsibility of serving the citizens and taxpayers of Bergen County, BCIA is in the process of exploring various alternatives concerning the future of the Bergen Regional Medical Center (the "Medical Center"), including Bergen County's and BCIA's possible divestiture and sale of the Medical Center. Among the reasons behind these considerations is the stark reality that a significant portion of the Medical Center's patient population originates from areas outside of Bergen County, and that Bergen County's taxpayers have been requested by Defendant Bergen Regional Medial Center, L.P. ("BRMCLP") to fund capital improvements at the Medical Center in the amount of $87 million over the next six years.

2.     In order to make an informed decision about the future of the Medical Center and which courses of action will best enable BCIA and Bergen County to fulfill their duties and commitments to the citizens and taxpayers of Bergen County, BCIA has requested that Defendants BRMCLP and Solomon Health Group, LLC ("Solomon"), which are responsible for management of the Medical Center, provide various categories of information relating to the Medical Center that is necessary for the proper evaluation of the options with respect to the future of the Medical Center.

3.     As set forth herein, despite BCIA's and the public's clear and unquestionable right to that information, Defendants BRMCLP and Solomon, in violation of their fiduciary, contractual and other legal duties, have failed to provide all the information requested. Instead, they have engaged in a series of dilatory tactics that, upon information and belief, are designed to frustrate and/or obstruct BCIA's and Bergen County's efforts of properly evaluating the options with respect to the future of the Medical Center in order that they may extend the existing lease and operating agreement for the Medical Center which is set to expire in 2017.

2

4.     In addition to the foregoing, BCIA has recently discovered that Defendants BRMCLP, Joseph Glaski ("Glaski"), Current Elevator Technology, Inc. ("Current Elevator"), Herman Lindenbaum ("Lindenbaum"), David Sebbag ("Sebbag"), United States Elevator, Inc. ("US Elevator"), John Does 1-100, and ABC Companies 1-100 have engaged in a conspiracy to (i) defraud BCIA in connection with a project to rehabilitate the elevators in buildings that comprise the Medical Center, including, but limited to, by inducing BCIA to pay BRMCLP hundreds of thousands of dollars for services that were never performed and equipment that was never installed, through intentional and deliberate double-billing and the submission of other deliberately false and misleading documentation to BCIA; and (ii) conceal their unlawful and illicit activities in a variety of ways, including by secretly moving equipment to avoid detection and interfering with BCIA's efforts to investigate this matter.

5.     BCIA also has recently discovered that Defendants Edward H. Hynes ("Hynes") and Elnatan Rudolph ("Rudolph"), who served as Executive Director of BCIA and Assistant to the Executive Director of BCIA during the period in question, willfully and maliciously breached their fiduciary and contractual duties to BCIA and contributed to the harm inflicted upon BCIA through the abdication of their responsibilities and submission of false and misleading certifications that induced BCIA to pay for the services and equipment that had already been paid for or had never been provided.

6.     Consequently, by this action, BCIA seeks, among other things, (i) judgment compelling certain defendants (sometimes referred to as the "Medical Center Information Defendants") to provide all the information sought so that BCIA and Bergen County may fulfill their obligations to the citizens and taxpayers of Bergen County as it relates to the future of the Medical Center; (ii) judgment against certain defendants (referred to as the "Conspirator

3

3182483.4

Defendants") for, among other things, compensatory and punitive damages and an accounting of all transactions relating to capital expenditures at the Medical Center that have been paid for by BCIA since January 1, 2005; and (iii) judgment against Hynes and Rudolph for compensatory and punitive damages, as well as disgorgement of the compensation paid to them during the period in question.

## PARTIES

7.      Plaintiff BCIA is a body corporate and politic of the State of New Jersey, established pursuant to the County Improvement Authorities Act, N.J.S.A. 40:37A-44 et seq., with its office located at One Bergen County Plaza, Hackensack, New Jersey.

8.      Defendant BRMCLP is a limited partnership with its principal place of business located at 230 East Ridgewood Avenue, Ridgewood, New Jersey. BRMCLP operates the Medical Center pursuant to a lease and operating agreement with BCIA described herein. BRMCLP is both part of the group of defendants referred to as the "Medical Center Information Defendants" and the "Conspirator Defendants" as designated herein.

### The Medical Center Information Defendants

9.      Defendant Solomon is, upon information and belief, (i) an affiliate of BRMCLP that renders or has rendered services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; (ii) a holder of certain Medical Center Information (as defined herein); (iii) a party to the lease and operating agreement with BCIA described herein; and (iv) a guarantor of the obligations of BRMCLP under the lease and operating agreement with BCIA described herein.

10.     Defendant Solomon Healthcare Group, LLC ("SHG") is a New Jersey Limited Liability Company with a business address at 230 East Ridgewood Avenue, Ridgewood, New Jersey. Upon information and belief, SHG is (i) an affiliate of BRMCLP that renders or has

4

3182483.4

rendered services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; and (ii) a holder of certain Medical Center Information (as defined herein).

11.     Defendant Global Employee Benefits Management, Inc., ("Global") is, upon information and belief, (i) an affiliate of BRMCLP that renders or has rendered services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; and (ii) a holder of certain Medical Center Information (as defined herein).

12.     Defendant iCare Management, LLC, ("iCare") is, upon information and belief, (i) an affiliate of BRMCLP that renders or has rendered services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; and (ii) a holder of certain Medical Center Information (as defined herein).

13.     Defendant Life Source Services, L.P. ("LSS") is, upon information and belief, (i) an affiliate of BRMCLP that renders or has rendered services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; and (ii) a holder of certain Medical Center Information (as defined herein).

14.     Defendant International Information Technologies, LP ("International") is, upon information and belief, (i) an affiliate of BRMCLP that renders or has rendered services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; and (ii) a holder of certain Medical Center Information (as defined herein).

15.     Defendant Bergen Regional Anesthesiology Group, PA ("Bergen Regional Anesthesiology Group"), is a medical practice group with offices located at 1060 Clifton Avenue, Clifton, New Jersey.  Upon information and belief, Bergen Regional Anesthesiology Group (i) renders medical services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; and (ii) is a holder of certain Medical Center Information (as defined herein).

3182483.4

16.     Defendant Bergen Regional Medical Center Radiology Associates, PA ("Bergen Regional Radiology Associates"), is a medical practice group with offices located at 00-100 28th Street, Fair Lawn, New Jersey. Upon information and belief, Bergen Regional Radiology Associates (i) renders medical services at the Medical Center pursuant to an agreement/arrangement with BRMCLP; and (ii) is a holder of certain Medical Center Information (as defined herein).

17.     Defendants Global, iCare, SHG, LSS, International, Bergen Regional Anesthesiology Group and Bergen Regional Radiology Associates are named herein as interested defendants because they may have in their possession or control Medical Information (as defined herein) that neither BRMCLP nor Solomon have.

18.     Defendants BRMCLP, Solomon, Global, iCare, SHG, LSS, International, Bergen Regional Anesthesiology Group and Bergen Regional Radiology Associates are sometimes referred to herein as the "Medical Information Defendants".

**The Conspirator Defendants**

19.     Defendant Current Elevator is, upon information and belief, a Pennsylvania Corporation with its place of business located in Milford, Pennsylvania.

20.     Defendant Glaski is an individual residing, upon information and belief, in the State of New York and, during the period of the conspiracy described herein, served Vice President of Facilities Management for Defendant BRMCLP.

21.     Defendant Lindenbaum is an individual residing, upon information and belief, in the State of New Jersey and is currently employed by BRMCLP as its Director of Engineering.

22.     Defendant Sebbag is an individual residing, upon information and belief, in the State of New Jersey and is a limited partner of BRMCLP.

6

23.     Defendant US Elevator is a New Jersey Corporation with its principal place of business located at 1275 Bloomfield Avenue, Fairfield, New Jersey.

24.     Defendants BRMCLP, Current Elevator, Glaksi, Lindenbaum, Sebbag, US Elevator, John Does 1-100 (described below) and ABC Companies 1-100 (described below) are sometimes referred to as the "Conspirator Defendants".

### The Former BCIA Director Defendants

25.     Defendant Hynes is an individual residing in the State of New Jersey and was the Executive Director of BCIA during the period in question herein.

26.     Defendant Rudolph is an individual residing in the State of New Jersey and was the Assistant to the Executive Director of BCIA during the period in question herein.

### The Fictitiously Named Defendants

27.     John Does 1-100 are fictitious parties whose identities are unknown at this time, and whom, upon information and belief, (i) provide various goods and/or services to the Medical Center pursuant agreements/arrangements with BRMCLP and/or its affiliates and are holders of certain Medical Center Information (as defined herein); (ii) participated in the conspiracy described herein; and/or (iii) aided and abetted the Conspirator Defendants in their unlawful and illicit activities.

28.     ABC Companies 1-100 are fictitious parties whose identities are unknown at this time and whom, upon information and belief, (i) provide various goods and/or services to the Medical Center pursuant agreements/arrangements with BRMCLP and/or its affiliates and are holders of certain Medical Center Information (as defined herein); (ii) participated in the conspiracy described herein; and/or (iii) aided and abetted the Conspirator Defendants in their unlawful and illicit activities.

3182483.4

## FACTUAL SUMMARY

### I.   BACKGROUND

#### A.   The County Ownership And Private Management Of The Medical Center

29.    The Medical Center, formerly known as Bergen Pines County Hospital, is a public hospital owned by Bergen County located at 230 East Ridgewood Avenue, Paramus, New Jersey. The Medical Center, with 1,185 beds and 22 hospital-related buildings and structures, is the largest public hospital in the State of New Jersey, and consists of three major divisions: Acute Care; Long Term Care; and Behavioral Health.

30.    A significant portion of revenues earned by the Medical Center are derived from public funding and reimbursement rates from Medicaid and Medicare.

31.    On or about December 17, 1997, Bergen County leased the Medical Center's real property and assets to BCIA for a term of 19 years.

32.    Effective March 15, 1998, Bergen County's operating license for the Medical Center, issued by the Department of Health and Senior Services ("DHSS") (the "DHSS License"), was transferred to BCIA.

33.    Effective March 15, 1998, BCIA and Solomon entered into a 19-year Lease and Operating Agreement (the "LOA"), pursuant to which BCIA retained the DHSS operating license and Solomon assumed responsibility to provide all management, administration, operation and maintenance services for the Medical Center.

34.    Effective March 15, 1998, Solomon entered into an Assignment and Guarantor Agreement with BRMCLP, pursuant to which BRMCLP assumed all of the rights and obligations of Solomon under the LOA and Solomon guaranteed the performance by BRMCLP of all its management services obligations under the LOA.

3182483.4

**B.    BRMCLP's Management Obligations Under The LOA**

35.    Under the LOA, BCIA and Solomon assumed responsibilities, as BCIA's agents and as the managers of the Medical Center, to provide day-to-day management, administration, operation and maintenance for the Medical Center. Specifically, Sections 3.1 and 3.2 of the LOA provide:

> **Section 3.1.  General.**  During the term of this Agreement, the Manager shall be obligated to manage and maintain Bergen Pines, as the BCIA's agent and on the BCIA's behalf, pursuant to the terms of this Agreement.

> **Section 3.2  Agreement to Manage Bergen Pines.**  The BCIA, as the holder of the Bergen Pines License and the Bergen Pines Licensed Capacity, is responsible for the overall conduct of Bergen Pines and compliance with all Applicable Laws.  By executing this Agreement, the BCIA has engaged the Manager, and the Manager has accepted such engagement, to manage, administer, operate and maintain Bergen Pines as the BCIA's agent, on the BCIA's behalf and for the BCIA's account, subject to the provisions of this Agreement (including without limitation, the provisions set forth in Section 3.3 and Article V hereof), in accordance with all Applicable Laws.

36.    More specifically, BRMCLP's and Solomon's management responsibilities include, among other things, the following:

- Maintaining the property and assets of the Medical Center at its sole cost and expense[1] (LOA Section 2.9);

- Selecting, paying, supervising, disciplining, hiring and terminating all employees required by the Manager to operate the Medical Center (subject to the County's pre-Operating Agreement employee related liabilities) (LOA Sections 3.3(d); 3.6(a));

- Selecting and hiring qualified administrators and assistant administrators (LOA Sections 3.3(e); 3.6(c));

- Establishing staff procedures and direction (LOA Section 3.3 (f));

- Purchasing and disposing of all equipment, supplies and services necessary to the Medical Center (LOA Section 3.3(g));

---

[1] BCIA is responsible for capital improvements as defined in the LOA.

- Establishing and implementing the operating procedures relating to the quality of healthcare services provided at the Medical Center (LOA Section 3.3(h));

- Providing all legal services necessary to the performance of its Management Services (LOA Section 3.3(j));

- Providing insurance (LOA Sections 3.8; 3.3(k));

- Implementing and monitoring a system of financial operations (including purchasing, disbursements, billing, collection of accounts receivable) and implementing cost-saving measures (LOA Section 3.3(l));

- Paying all operating expenses of the Medical Center (LOA Section 3.3(m));

- Providing ongoing review and monitoring of all operations of the Medical Center to the appropriate governmental authorities (LOA Section 3.3(n));

- Entering into subcontracts for certain services (LOA Section 3.12);

- Establishing all accounting, bookkeeping, recordkeeping and reporting procedures (LOA Section 3.3(s)); and

- Operating and maintaining the facilities and equipment of the Medical Center (LOA Section 3.3(t)).

3182483.4

## II.   FACTS RELATING TO BCIA'S ATTEMPT TO OBTAIN THE MEDICAL CENTER INFORMATION

### A.   The Substantial Fees Paid To BCIA's Affiliates By The Medical Center

37.   BRMCLP and Solomon have over the years delegated many of their management responsibilities under the LOA to its affiliates, including, upon information and belief, SHG, Global, iCare, LSS and International.

38.   Upon information and belief, Global was formed to assist in managing and contracting out insurance benefits for the Medical Center's managed operations. The Medical Center has paid Global substantial monthly premiums to manage the employee health insurance claims and other claims. For example, upon information and belief, the amount of premiums paid to Global amounted to $18,000,000 in certain years.

39.   Upon information and belief, the Medical Center has paid SHG fees in the amount of $7,800,000 in certain years.

40.   Upon information and belief, the Medical Center has paid iCare fees in the amount $1,500,000 in certain years.

41.   Upon information and belief, the Medical Center has paid substantial fees to LSS.

42.   Upon information and belief, the Medical Center has paid substantial fees to International.

### B.   BRMCLP's And Solomon's Disclosure/Access Obligations Under The LOA

43.   Under the LOA, BRMCLP and Solomon are required to disclose financial information to BCIA and provide access to BCIA to various information, records, documents and contracts pertaining to the Medical Center and the DHSS License. Specifically, BRMCLP and Solomon are required to comply with the following obligations:

11

3182483.4

(A) Books and Records. Maintain the books and records required by Applicable Law and, within 30 days after the end of each month, submit both cumulative and monthly unaudited financial statements for the prior month, which financials are to be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). (LOA, Section 3.3(o));

(B) Audited Financial Statements. Prepare and file with BCIA audited financial statements, consistent with GAAP, with respect to their operations. Such financial statements are to be prepared by an independent certified public accountant and filed with the BCIA within six (6) months of each fiscal year end. (LOA, Section 9.25(c), as amended);

(C) Agreements With Third Parties. Maintain copies of all material contracts, leases and agreements executed by the BCIA with respect to the performance of its obligations under the Operating Agreement and make copies thereof available to the BCIA for inspection and copying. (LOA, Section 3.3(r)); and

(D) Access To Medical Center and Records. Provide reasonable access to the Medical Center, including all records thereof, to BCIA, at all times, upon reasonable notice by BCIA. (LOA, Section 9.24).

**C.   BRMCLP's And Solomon's Obligations To Assure The Medical Center's Compliance With All Statutory And Regulatory Requirements**

44.    Under the LOA, BRMCLP and Solomon are required to act in a manner that assures the Medical Center's and BCIA's compliance with, among other things, the substantial statutory and regulatory requirements that they are governed by. Specifically, the LOA provides that the management services to be provided by BRMCLP and Solomon are to be undertaken and carried out by them so as to assure compliance, among other things, all "Operating Requirements", which is defined as all statutory and regulatory requirements applicable to the Medical Center. Such Operating Requirements include, but are not limited to:

- 42 C.F.R. 482.12 (Condition of Participation for Medicare)

- Health Care Financing Administration Part 483 – Requirements for Long-Term Care Facilities, 42 C.F.R.§§ 483.1-483.75;

- N.J.A.C. 8:39-1./1 to 46.6, inclusive (Standards for Licensure of Long-Term Care Facilities);

12

- N.J.A.C. 8:42A-1.1 et seq. (Alcoholism Treatment Facilities);

- N.J.A.C. 8:42B-1.1 to 22.3, inclusive (Manual of Standards for Licensure of Drug Treatment Facilities);

- N.J.A.C. 8:43A-1.2 to 29.4, inclusive (Manual of Standards for Licensure of Ambulatory Care Facilities);

- N.J.A.C. 8:43F-1.1 et seq. (Adult Day Health Care Facilities);

- N.J.A.C. 8:43G-1.1 to 35.9, inclusive (Hospital Licensing Standards);

- N.J.A.C. 8:43H-1.1 to 24.28, inclusive (Manual of Standards for Licensure of Rehabilitation Hospitals);

- N.J.A.C. 8:44-2.1 et seq. (State Sanitary Code: Operation of Clinical Laboratory);

- N.J.A.C. 8:45-1.1 et seq. (Clinical Laboratory Services);

- N.J.A.C. 8:57-1.1 et seq. (Communicable Diseases);

- N.J.A.C. 8::57A-1.1 et seq. (Cancer Registry);

- N.J.A.C. 10:35-1.1-5.2, inclusive (Operation of County Psychiatric Facilities);

- N.J.A.C. 10:37E-1.1 et seq. (Outpatient Service Standards);

- N.J.A.C. 10:37F-1.1 et seq. (Partial Care Services Standards);

- N.J.A.C. 10:52-1.1 et seq. (Hospital Services Manual);

- N.J.A.C. 10:56-1.2 et seq. (Manual for Dental Services);

- N.J.A.C. 10:63-1.1 et seq. (Long Term Care Services);

- N.J.S.A. 26:2H-1 et seq. (Health Care Facilities);

- N.J.S.A. 30:4-1 et seq. (as applicable to County Facilities);

- N.J.S.A. 30:6C-1 et seq. (as applicable to County Facilities); and

- N.J.S.A. 30:9-1 et seq. (County Asylums and Hospitals).

(LOA, Section 1.1).

3182483.4

**D.** **BCIA Has Placed A Special Trust And Confidence In BRMCLP, Solomon, And Their Officers and Directors With Respect To The Medical Center**

45. In recognition that the Medical Center and BCIA are subject to substantial statutory and regulatory requirements, BRMCLP's and Solomon's obligations under the LOA also include, without limitation:

(A) Taking all necessary actions to ensure that the Medical Center complies with all Operating Requirements; and

(B) Providing ongoing review of the DHSS License and the Certificate of Need and Operating Requirements for the purpose of keeping the BCIA advised of necessary and/or beneficial changes to the operations of the Medical Center; and

(LOA, Section 3.3).

46. In delegating critical managerial and regulatory compliance responsibilities to BRMCLP and Solomon, BCIA has placed a special trust and confidence in BRMCLP and Solomon.

47. Defendants BRMCLP and Solomon, in turn, have accepted the delegation of those critical managerial and regulatory compliance responsibilities and the special trust and confidence placed upon them by BRMCLP.

**E.** **BRMCLP's Requests For Costly Capital Improvements**

48. BRMCLP has submitted to Bergen County and BCIA a number of requests relating to the future of the Medical Center, including for capital improvements.

49. Specifically, BRMCLP has requested capital improvements for 2011 totaling approximately $13.2 million. That is just a portion of BRMCLP's proposed six-year plan totaling $87 million in capital improvements at the Medical Center.

3182483.4

### F.   BCIA's Obligation To Explore Possible Sale Of The Medical Center

50.   As a governmental authority charged with the obligation to serve the citizens and taxpayers of Bergen County, and as the holder of the DHSS License charged with the responsibility to ensure that quality of care at the Medical Center is not adversely affected, BCIA is committed to addressing and fully considering all matters relating to the Medical Center in light of the interests of the citizens and tax payers of Bergen County. Toward that end, BCIA is in the process of exploring various alternatives concerning the future of the Medical Center, including Bergen County's and BCIA's possible divestiture and sale of the Medical Center.

51.   In order to make an informed decision about the future of the Medical Center and which courses of action will best enable BCIA and Bergen County to fulfill their duties and commitments to the citizens and taxpayers of Bergen County, BCIA and Bergen County need to consider all relevant factors relating to the operations of the Medical Center. These factors include not only patient demographics and the cost of anticipated capital improvements, but also financial and operational information regarding the Medical Center.

52.   The foregoing information is essential to a complete understanding of the operation of the Medical Center and to allow BCIA to fully evaluate it.

### G.   BCIA's Demand For Information Relating To The Medical Center

53.   By letter dated October 4, 2011, in accordance with the provisions of the LOA, BCIA advised Solomon of the foregoing through its principal, V. Robert Salazar, and requested that BCIA be provided with various information relating to the Medical Center, within 30 days, so that BCIA and Bergen County would be capable of fulfilling their obligations to the

3182483.4

taxpayers and citizens of Bergen County. (A copy of the October 4, 2011 letter from BCIA to

Salazar is attached hereto as *Exhibit 1*).

### The Medical Center Information

54.     More specifically, BCIA requires and has requested the following information

relating to the Medical Center (collectively, the "Medical Center Information"):

I.      Audited financial statements on a consolidated basis for BRMCLP and its subsidiaries for the years 2008, 2009 and 2010;

II.     Listing and explanation of any prior period adjustments relating to the audited financial statements of BRMCLP and its subsidiaries for the years 2007, 2008, 2009 and 2010;

III.    New Jersey FAST (Financial Analysis and Statistical Trends) involving the Medical Center for the years 2008, 2009 and 2010;

IV.     New Jersey APOLLO reports as prepared by the New Jersey Health Care Facilities Financing Authority relating in any way to BRMCLP and/or the Medical Center for the years 2008, 2009 and 2010;

V.      Budgets for the various divisions of the Medical Center for the years 2009 and 2010;

VI.     Documents reflecting, referring or relating to comparisons of (a) budgets for the various divisions of the Medical Center for the years 2009 and 2010, and (b) the actual expenditures for the various divisions of the Medical Center for the years 2009 and 2010;

VII.    Managed care contracts involving the Medical Center currently in effect;

VIII.   Labor, union and/or collective bargaining agreements involving the Medical Center that are currently in effect;

IX.     Reports filed with the New Jersey Department of Health and Senior Services (the "DHSS") on behalf of the Medical Center, including, but not limited to, all UB-92 data, sentinel events and corrective action plans for the years 2008, 2009 and 2010;

X.      Documents reflecting patient age, residence and/or demographics filed with the DHSS on behalf of the Medical Center for the years 2008, 2009 and 2010;

XI.     Documents reflecting the payor mix at the Medical Center for the years 2008, 2009 and 2010;

16

3182483.4

XII. Documents reflecting, referring or relating to Joint Commission reviews of BRMCLP and/or the Medical Center including, but not limited to, reports, findings and corrective action plans;

XIII. DHSS annual reviews and inspection reports involving the Medical Center for 2008, 2009 and 2010;

XIV. Documents reflecting, referring or relating to Medical Center market share analysis by age, DRG and/or town of origin for all licensed beds currently managed by BRMCLP at the Medical Center;

XV. Documents reflecting, referring or relating to compliance audits, including licensure review, for the Medical Center for the years 2007, 2008, 2009 and 2010;

XVI. Listing of any self insurance funds including, but not limited to health care, property, liability and medical malpractice, involving the Medical Center;

XVII. Insurance contracts, including contracts for health insurance benefits, property and liability, medical malpractice and director and officer's liability, currently in effect involving the Medical Center;

XVIII. Listing of all open legal claims including, but not limited to, medical malpractice claims, involving the Medical Center;

XIX. Contracts between the Medical Center and any physicians;

XX. Listing of physicians on staff at the Medical Center, including, for each (a) all board certifications specialties and sub-specialties, (b) age, (c) description of hospital activity, and (d) primary office location;

XXI. Documents reflecting, referring or relating to any clinical and referral affiliations between the Medial Center and any healthcare providers;

XXII. Organizational charts reflecting and/or identifying management personnel at the Medical Center;

XXIII. Resumes of all managerial-level personnel at the Medical Center, including but not limited to, administration and clinical staff managerial-level personnel;

XXIV. Documents reflecting, referring or relating to capital budget needs for the Medical Center;

XXV. Agreements or waivers reflecting, referring or relating to negotiated charity care, Medicaid or Medicare enhancements, including, but not

3182483.4

limited to, DSH (Disproportionate Share Hospital) enhancements, involving the Medical Center;

XXVI. Contracts with Information Technology providers including, but not limited to, electronic health records, information technology software support, financial support, medical billing support, involving the Medical Center;

XXVII. Contracts with any subsidiaries of BRMCLP involving the Medical Center;

XXVIII. A listing and copies of all contracts with any external vendors providing revenue cycle support including, but not limited to medical coding, accounts receivable acceleration, denial rate reports, patient accounting system, and/or collection agencies; and

XXIX. Reports analyzing accounts receivables, patient coding, collection rate, patient information data base, charity bad debt percentages, and/or contract management systems, involving the Medical Center.

55.    By letter dated October 7, 2011, BCIA made the same request for the Medical Center Information to BRMCLP through its President and Chairman of the Board, Joseph S. Orlando. Specifically, BCIA wrote:

Dear Mr. Orlando:

Enclosed is a copy of our October 4, 2011 letter to V. Robert Salazar, which we incorporate herein by reference. We trust that you will facilitate our receipt of the information requested therein.

(A copy of the October 7, 2011 letter from BCIA to Orlando is attached hereto as *Exhibit 2*).

### H.    BRMCLP And Solomon Fail To Provide All The Medical Center Information Requested

56.    On November 4, 2011, BRMCLP provided certain documents requested by BCIA, but failed to provide other documents and information that had been requested by BCIA.

3182483.4

### (i)  BCIA's Supplemental Request For Medical Center Information

57.  By letter dated November 18, 2011, BCIA made a supplemental request for medical center information (the "Supplemental Medical Center Information")[2] to both BRMCLP and Solomon to be delivered by no later than December 19, 2011. (A copy of the November 18, 2011 letter from BCIA to BRMCLP and Solomon is attached hereto as *Exhibit 3*).

58.  Despite BCIA's repeated requests for the Supplemental Medical Center Information, and BCIA's and the public's clear and unquestionable right to that information, Defendants BRMCLP and Solomon have failed to provide all of it.  Instead, they have engaged in a series of dilatory tactics that, upon information and belief, are designed to frustrate and/or obstruct BCIA's and Bergen County's efforts to obtain all the information requested, in order that they may extend the existing LOA for the Medical Center which is set to expire in 2017.

59.  By way of illustration, instead of providing all the Supplemental Medical Center Information, by letter dated December 5, 2011, BRMCLP submitted a voluminous proposal to BCIA formally requesting a ten-year extension of the LOA, which is currently due to expire in March, 2017. (A copy of the December 5, 2011 letter from BRMCLP to BCIA (without attachments) is attached hereto as *Exhibit 4*).[3]

60.  To date, Defendants BRMCLP and Solomon have failed to provide all the Supplemental Medical Information Requested.

---

[2] The Supplemental Medical Center Information reiterated and clarified the requests for Medical Center Information that Defendants BRMCLP and Solomon had failed to provide.

[3] By letter dated December 8, 2011, BCIA rejected BRMCLP's proposal and reiterated its need for the Supplemental Medical Center Information by no later than December 19, 2011. (A copy of the December 8, 2011 letter from BCIA to BRMCLP is attached as *Exhibit 5*).

3182483.4

61.     Solomon's and BRMCLP's actions are depriving BCIA and Bergen County of the information that is necessary to make an informed decision about the future of the Medical Center and which courses of action will best enable BCIA and Bergen County to fulfill their duties and commitments to the citizens and tax payers of Bergen County.

## III.    FACTS RELATING TO THE CONSPIRACY

### A.    The Elevator Project

62.     By way of background, in or about 2005 or 2006, BRMCP represented to BCIA that extensive work would have to be performed on the elevators (the "Elevators") in buildings that comprise the Medical Center (the "Elevator Project"), and that the costs associated therewith would be capital expenditures (rather than routine maintenance) that BCIA ultimately would be responsible for.

63.     During that period, Current Elevator was the contractor that had been retained by BRMCLP to provide maintenance and related services for the Elevators and continued in that capacity until it was replaced by US Elevator in or about 2010.

64.     BCIA has recently learned that at some point either prior to or during the course of the Elevator Project, BRMCLP, Glaski, Current Elevator, John Does 1-100, and ABC Companies 1-100 conspired and agreed to defraud BCIA, including, but not limited to, by inducing BCIA to pay for services and equipment that either (i) had already been paid for, or (ii) had never been provided.

### B.    Hynes' And  Rudolph's Contribution To Harm Sustained By BCIA

65.     BCIA also has recently learned that Hynes and Rudolph willfully and maliciously breached their fiduciary and contractual duties to BCIA and contributed to the harm inflicted upon BCIA through the abdication of their responsibilities and submission of

3182483.4

false and misleading certifications that induced BCIA to pay for the services and equipment described herein.

66.     During his tenure as Executive Director of BCIA, Hynes repeatedly told BCIA staff that wanted nothing to do with the Medical Center and spent little time, if any, on matters concerning oversight of the Medical Center.

67.     During his tenure as Assistant to the Executive Director of BCIA, Rudolph treated his position as essentially a "no-show job" that paid him a salary of $95,000 a year. He spent little or no time at the Medical Center, spent little time at BCIA's office, and rarely informed BCIA's staff where he was at other times. In fact, other than occasionally signing documents, BCIA's staff did not know what he did or what his responsibilities were.[4]

---

[4] Rudolph is a political consultant and former member of the Teaneck Town Council. According to an article published in "City & State" on August 30, 2010, he used his political connections to land his position at BCIA, and then devoted his time to one of the three consulting firms he was involved in during the relevant period. That article, in part, states the following about Rudolph:

Rudolph, meanwhile, has been holding down more than a few jobs of his own. The son of Bruce Rudolph, the New York City Department of Design and Construction director, Elnatan won election to the Teaneck Town Council in mid-2006 at the age of 25 with the support of the Bergen County Party boss, Joseph Ferriero. (Ferriero has since been forced to step down as party boss after a mail-fraud conviction.)

Then, in January 2007, Ferriero got the then-25-year-old a $95,000-a-year job as the Assistant to the director of the Bergen County Improvement Authority, which Rudolph held while on the Teaneck Council.

Throughout, Rudolph kept running one of his consulting firms, RWR Strategy Group, which pulled in over $965,000 in payments between 2006 and 2008 from New York campaigns alone, according to campaign finance records, including for Steve Pigeon ally Gary Parenti's Assembly campaign and Pigeon's political action committee.

For a stretch, he also served as a part-time New York Assembly staffer (he had held another Assembly job before being elected to the Teaneck Council). Rudolph now runs his new consulting firm, Cornerstone Management, out of a house in Teaneck. In June, he landed $100,000 of consulting work doing mailers for the Democratic Senate Campaign Committee.

(http://www.cityandstateny.com/michael-cohen-and-elnatan-rudolph-ny-staffers-well-paid-consultants-nj-candidates/).

3182483.4

68.     At all times relevant herein, Defendants Hynes and Rudolph, in their capacities as BCIA's Executive Director and Assistant to the  Executive Director, were responsible for verifying that the services and equipment described in the documentation submitted to BCIA by BRMCLP (through Glaski or otherwise) had in fact been received and rendered.

**C.     Double Billing For Services And Equipment Relating To Elevators**

69.     Through the willful and intentional double-billing, deliberately false and misleading certifications, and abdication of responsibilities described herein, BRMCLP, Glaski and Current Elevator deliberately induced, and Hynes and Rudolph allowed, BCIA to pay significant amounts of money for services and equipment on various elevators at the Medical Center that had previously been billed to and paid for by BCIA.  Specifically:

**(i)     Double Billing For Jack - Building 1, Elevator 1**

70.     On August 22, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase order in the amount of $61,000 for the installation of a new jack in elevator 1 of building 1, a supporting invoice from Current Elevator, and a voucher (No. 15766) requesting payment of that amount. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

71.     On September 11, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a separate purchase order in the amount of $61,000 for the installation of the same new jack in elevator 1 of building 1, a supporting invoice from Current Elevator, and a separate voucher (No. 17743) requesting another payment in the amount of

22

$30,000 for the installation of the same equipment that BCIA had previously been charged for. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

72.     On September 18, 2007, Rudolph executed the payment voucher that had been submitted by Glaski on September 11, 2007. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

73.     Rudolph's certification was (i) false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered, and (ii) misleading inasmuch as it failed to reveal that BRMCLP had submitted a separate payment voucher for the same services and equipment just three weeks earlier.

74.     In reliance upon the documentation submitted, and Rudolph's false and misleading certification, BCIA paid $30,000 to BRMCLP.

75.     On October 22, 2007, Hynes executed the payment voucher that had been submitted by Glaski on August 22, 2007. On that payment voucher, Hynes certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

76.     Hynes' certification was (i) false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or

3182483.4

rendered, and (ii) misleading inasmuch as it failed to reveal that BRMCLP had submitted a separate payment voucher for the same services and equipment and that BCIA had already paid it.

77.     In reliance upon the documentation submitted, and Hynes' false and misleading certification, BCIA paid an additional $61,000 to BRMCLP.

### (ii)     Double Billing For Hoist Ropes - Building 8, Elevator 4

78.     On March 5, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase order in the amount of $31,500 for the installation of hoist ropes in elevator 4 of building 8, a supporting invoice from Current Elevator, and a voucher (No. 15703) requesting payment of that amount.   On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

79.     On March 20, 2007, Rudolph executed the payment voucher that had been submitted by Glaski on March 5, 2007. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

80.     Rudolph's certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

81.     In reliance upon the documentation submitted, and Rudolph's false certification, BCIA paid $31,500 to BRMCLP.

24

3182483.4

82.    On March 24, 2008, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase requisition in the amount of $31,500 for the installation of <u>the same hoist ropes in elevator 4 of building 8</u>, a supporting invoice from Current Elevator, and a separate voucher (No. 20926) requesting another payment of $31,500 for the installation of the same equipment that BCIA had previously been charged for.[5]   On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

83.    On April 22, 2008, Rudolph executed the payment voucher that had been submitted by Glaski on March 24, 2008. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

84.    Rudolph's certification was (i) false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered, and (ii) misleading inasmuch as it failed to reveal that BRMCLP had submitted a separate payment voucher for the same services and equipment and that BCIA had already paid it.

85.    In reliance upon the documentation submitted, and Rudolph's false and misleading certification, BCIA paid an additional $31,500 to BRMCLP.

---

[5] The voucher references building 6, elevator 4, but that was clearly misleading because

3182483.4

(iii)    **Double Billing For Hoist Ropes - Building 6, Elevator 1**

86.    On October 11, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase requisition in the amount of $7,500 for the installation of hoist ropes on elevator 1 of building 6 a supporting invoice from Current Elevator, and a voucher (No. 11500) requesting payment of that amount. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

87.    On October 22, 2007, Hynes executed the payment voucher that had been submitted by Glaski on October 11, 2007. On that payment voucher, Hynes certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

88.    Hynes' certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

89.    In reliance upon the documentation submitted, BCIA paid $7,500 to BRMCLP.

90.    On or about October 24, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase requisition in the amount of $7,900 for the installation of the same hoist ropes on elevator 1 of building 6, a supporting invoice from Current Elevator, and a separate voucher (No. 11506) requesting payment of $7,900 for the installation of the same equipment that BCIA had previously been charged for.  On that

building 6 has only two elevators and the purchase requisition references building 8, elevator 4.

3182483.4

payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

91.     On November 20, 2007, Hynes executed the payment voucher that had been submitted by Glaski on October 24, 2007. On that payment voucher, Hynes certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

92.     Hynes' certification was (i) false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered, and (ii) misleading inasmuch as it failed to reveal that BRMCLP had submitted a separate payment voucher for the same services and equipment and that BCIA had already paid it.

93.     In reliance upon the documentation submitted, and Hynes' false and misleading certification, BCIA paid an additional $7,900 to BRMCLP.

**(iv)     Double Billing For Drive Unit - Building 8, Elevator 4**

94.     On or about October 24, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase requisition in the amount of $12,500 for the installation of a new drive on elevator 4 of building 8, a supporting invoice from Current Elevator, and a voucher requesting (No. 15507) payment of that amount. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the

27

articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

95.    On November 20, 2007, Hynes executed the payment voucher that had been submitted by Glaski on October 24, 2007. On that payment voucher, Hynes certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

96.    Hynes' certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

97.    In reliance upon the documentation submitted, and Hynes' false certification, BCIA paid $12,500 to BRMCLP.

98.    On or about March 24, 2008, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase requisition in the amount of $12,490 for the installation of the same new drive on elevator 4 of building 8, a supporting invoice from Current Elevator, and a separate voucher (No. 20928) requesting payment of $12,490 for the installation of the same equipment that BCIA had previously been charged for. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

28

3182483.4

99.     On April 22, 2008, Rudolph executed the payment voucher that had been submitted by Glaski on March 24, 2008. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

100.    Rudolph's certification was (i) false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered, and (ii) misleading inasmuch as it failed to reveal that BRMCLP had submitted a separate payment voucher for the same services and equipment and that BCIA had already paid it.

101.    In reliance upon the documentation submitted, and Rudolph's false and misleading certification, BCIA paid an additional $12,490 to BRMCLP.

### (v)     Double Billing For Key Switches - Buildings 6 & 8 Elevators

102.    On November 14, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a check requisition in the amount of $11,000, for the installation of fire key switches on elevators in building 8, a supporting invoice from Current Elevator, and a voucher (No. 20818) requesting payment of that amount.  On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

103.    On December 5, 2007, Hynes executed the payment voucher that had been submitted by Glaski on November 14, 2007. On that payment voucher, Hynes certified as

3182483.4

follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

104.   Hynes' certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

105.   In reliance upon the documentation submitted, and Hynes' false certification, BCIA paid $11,000 to BRMCLP.

106.   On December 4, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a check requisition in the amount of $79,100, which included $8,000 for the installation of fire key switches on elevators in building 6, a supporting invoice from Current Elevator, and a voucher (No. 20830) requesting payment of 79,100.  On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

107.   On January 3, 2008, Rudolph executed the payment voucher that had been submitted by Glaski on December 4, 2007. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

108.   Rudolph's certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

3182483.4

109.    In reliance upon the documentation submitted, and Rudolph's false certification, BCIA paid $79,100 to BRMCLP, which included $8,000 for the fire key switches on the building 6 elevators.

110.    On or about February 11, 2008, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a check requisition in the amount of $13,200 for the installation of <u>fire key switches on elevators in buildings 6 (again), 8 (again)</u>, 11, and 14, a supporting invoice from Current Elevator, and a separate voucher (No. 20953) requesting payment of $13,200, in part for the installation of the same equipment that BCIA had previously been charged for.  On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

111.    On April 22, 2008, Rudolph executed the payment voucher that had been submitted by Glaski on February 11, 2008. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

112.    Rudolph's certification was (i) false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered., and (ii) misleading inasmuch as it failed to reveal that BRMCLP had submitted a separate payment vouchers for the same services and equipment and that BCIA had already paid them.

3182483.4

113.    In reliance upon the documentation submitted, and Rudolph's false and misleading certification, BCIA paid $13,200 to BRMCLP, which included an undetermined amount for the same fire key switches that had previously been paid for.

**D.    The Hundreds of Thousands of Dollars In Services That Were Never Rendered And Equipment That Was Never Installed In The Building 11 Elevators**

114.    In addition, through the submission of deliberately false and misleading documents and certifications, and the abdication of responsibilities described herein, BRMCLP, Glaski and Current Elevator intentionally and maliciously induced, and Hynes and Rudolph allowed, BCIA to pay for services that were never performed and equipment that was never installed on the elevators at building 11 of the Medical Center. More specifically:

115.    On August 28, 2006, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase order in the amount of $264,500 for the installation of drives, controllers, chokes and transformers on elevators 1-6 of building 11, a supporting invoice from Current Elevator, and a voucher (No. 17692) requesting partial payment in the amount of $132,000. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

116.    On September 18, 2006, Hynes executed the payment voucher that had been submitted by Glaski on August 28, 2006. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

32

117. Hynes certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

118. In reliance upon the documentation submitted, and Hynes' false certification, BCIA paid $132,000 to BRMCLP. However, those services were never rendered and the equipment was never installed.

119. On November 2, 2006, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase order in the amount of $264,500 for the installation of drives, controllers, chokes and transformers elevators 1-6 of building 11, a supporting invoice from Current Elevator, and a voucher (No. 17740) requesting partial payment in the amount of $75,000.

120. In reliance upon the documentation submitted, BCIA paid $75,000 to BRMCLP. However, those services were never rendered and that equipment was never installed.

121. On or about April 27, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase order in the amount of $24,900 for the installation of new ropes and elevator hoisting sheeves in elevator 3 of building 11, a supporting invoice from Current Elevator, and a voucher (No. 15714) requesting partial payment in the amount of $24,900. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

3182483.4

122.  On May 21, 2007, Hynes executed the payment voucher that had been submitted by Glaski on or about April 27, 2007. On that payment voucher, Rudolph certified as follows: "I hereby certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

123.  Rudolph's certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

124.  In reliance upon the documentation submitted, and Hynes' false certification, BCIA paid $24,900 to BRMCLP. However, those services were never rendered and that equipment was never installed.

125.  On June 7, 2007, Glaski, on behalf of BRMCLP, submitted documentation to BCIA, including a purchase order in the amount of $264,500 for the installation of drives, controllers, chokes and transformers elevators 1-6 of building 11, a supporting invoice from Current Elevator, and a voucher (No. 15736) requesting partial payment in the amount of $24,000. On that payment voucher, BRMCLP, through Glaski, swore under oath as follows: "I do solemnly declare and certify under the penalties of the law that the within bill is correct in all its particulars; that the articles have been furnished or services rendered as stated therein; that no bonus has been given or received by any person or persons within the knowledge of this claimant in connection with the above claim; that the amount therein stated is justly owing; and that the amount charged is a reasonable one."

126.  On July 11, 2007, Hynes executed the payment voucher that had been submitted by Glaski on June 7, 2007. On that payment voucher, Hynes certified as follows: "I hereby

34

3182483.4

certify from personal knowledge that all of the goods and services charged for in the within claim have been received and rendered."

127.    Hynes' certification was false inasmuch as he had no such personal knowledge and no idea whether the equipment and services charged for had been received or rendered.

128.    In reliance upon the documentation submitted, and Hynes' false certification, BCIA paid $24,000 to BRMCLP.  However, those services were never rendered and that equipment was never installed.

### E.    The Concealment Of The Unlawful and Illicit Activities From BCIA

129.    Upon information and belief, in furtherance of the conspiracy, BRMCLP, Current Elevator, Lindenbaum, Sebbag and US Elevator implemented a scheme designed to conceal and prevent the discovery of the afore-described unlawful and illicit activities in a variety of ways.

#### (i)    The Elevator Equipment Is Hidden

130.    Initially, the equipment for the building 11 elevators that BCIA had paid for was hidden in an elevator mechanical room at the Medical Center in order to conceal the fact that it was never installed.

131.    Later, when Current Elevator was replaced by US Elevator in or about 2010, BRMCLP directed US Elevator to move the equipment off-site in a further attempt to conceal the fact that it was never installed.

132.    US Elevator, in concert with BRMCLP and in an effort to conceal the unlawful and illicit activities of its client, stored the equipment at its facility in Fairfield, New Jersey, notwithstanding the fact that BCIA had paid for the purchase and installation of that equipment several years earlier.

3182483.4

(ii)     **BCIA's Inquiry Into The Matter Triggers A Cover-Up**

133.     In January of 2012, BCIA became aware that elevator 6 in building 11 apparently had been without a motor and not functioning for a significant period of time, despite the hundreds of thousands dollars that BCIA had paid to BRMCLP for the Elevator Project. As a consequence, BCIA initiated an inquiry concerning the matter. Specifically, BCIA contacted Defendant Lindenbaum, BRMCLP's Director of Engineering, and requested documentation pertaining to the work that BCIA believed had been performed years earlier on the building 11 elevators.

### Lindenbaum's And Sebbag's Involvment

134.     BCIA's inquiry and request to Lindenbaum triggered a flurry of actions, the sole and principal object of which was to conceal the unlawful and illicit actions of the Conspirator Defendants and to provide false explanations for those actions.

135.     More specifically, BRMCLP and, upon information and belief, Lindenbaum directed US Elevator to return and commence installing the equipment on the building 11 elevators in the hope that BCIA would not discover the fact that the equipment that BCIA had paid for several years earlier had never been installed.

136.     In addition, Sebbag, a principal of BRMCLP, contacted Glaski, who is no longer affiliated with BRMCLP, and specifically instructed Glaski not to cooperate with BCIA's investigation of the matter. Sebbag did so with the purpose and intent of interfering with BCIA's effort to uncover the truth concerning the BRMCLP's unlawful and illicit activities.

137.     Sebbag's conduct is the epitome of duplicity. Indeed, around the same time that he instructed Glaski not to cooperate with BCIA's investigation, Sebbag and his co-

3182483.4

conspirators (as set forth herein) advised BCIA that Glaski was an independent contractor and was responsible for the unlawful and illicit conduct.

### (iii) Documents Relating To The Elevator Project Are Withheld From BCIA

138.   BRMCLP also attempted to conceal its unlawful and illicit activities by withholding from BCIA documents relating to the Elevator Project and, upon information and belief, by interfering with BCIA's attempt to obtain such documents directly from Current Elevator.

139.   As the manager of the Medical Center and the company that initiated, oversaw and managed the entirety of the Elevator Project, BRMCLP should have in its possession all documents relating to the Elevator Project, including, but not limited to, proposals, invoices, purchase orders, reimbursement vouchers, and inspection reports. However, in furtherance of the conspiracy, and in an effort to conceal the unlawful and illicit activities of his employer, Defendant Lindenbaum falsely advised BCIA on February 8, 2012 that BRMCLP had not located any such documentation.

140.   Lindenbaum's response led to a review of the internal documentation that had been submitted to BCIA by BRMCLP, Glaski and Current Elevator and revealed some of the intentional and unlawful double-billing, which BCIA now suspects is likely to have extended beyond the Elevator Project and into other capital expenditures at the Medical Center that BCIA has paid.

141.   As part of its investigation into the matter, BCIA, by letter dated February 24, 2012, formally requested from BRMCLP more specific documents and information concerning the Elevator Project, including, among other things, a detailed explanation why elevator

3182483.4

equipment had been removed from the Medical Center years earlier and mysteriously began to reappear.  Specifically, BCIA requested the following:

- Copies of all documents reflecting, referring, relating to and/or supporting Bergen Regional Medical Center, LP's ("BRMCLP") request(s) to BCIA for capital improvements in connection with the elevators at the Medical Center;

- Copies of all bids, requisitions, proposals (including, but not limited to, any proposals by Current Elevator Technology and/or United States Elevator) and/or similar documents that identify specific work that was bid, proposed, authorized, paid for and/or completed in connection with the elevators at the Medical Center;

- A detailed explanation as to why elevator-related materials that were paid for and were to be installed at the Medical Center were removed from the Medical Center several years ago and why some of them mysteriously reappeared at the Medical Center this week.  In addition, provide copies of any and all documents reflecting, referring or relating to the foregoing;

- A detailed explanation as to why Current Elevator Technology was present at the Medical Center this week, and copies of any and all documents reflecting, referring or relating to the foregoing;

- A detailed explanation to the matters that BRMCLP (or its agents) discussed with Current Elevator Technology in connection with its presence at the Medical Center this week, and copies of any and all documents reflecting, referring or relating to the foregoing;

- Copies of all inspection reports relating to the elevators at the Medical Center for the last five (5) years;

- Copies of all documents reflecting, referring or relating to communications by or on behalf of the Medical Center with The Joint Commission in connection with the elevators at the Medical Center;

- Copies of all documents reflecting, referring or relating to submissions by or on behalf of the Medical Center to The Joint Commission in connection with the elevators at the Medical Center;

- Copies of all documents reflecting, referring or relating to reports issued by The Joint Commission in connection with the elevators at the Medical Center;

- A detailed explanation as to any work that you are planning to perform in connection with the elevators at the Medical Center, including, but not limited to, the name of the contractor involved and the names of the responsible

3182483.4

individuals working for those companies, and copies of any and all documents relating to the foregoing.

142.    In addition, by letter dated February 24, 2012, BCIA requested that Current Elevator provide various documents pertaining to the Elevator Project. Current Elevator responded initially that it was willing to provide such documents. However, Current Elevator later informed BCIA that it was not willing to do so. Upon information and belief, and consistent with Sebbag's instruction to Glaski, BRMCLP instructed Current Elevator to refrain from providing such documents to BCIA and cooperating with BCIA's investigation.

143.    Furthermore, rather than providing the documents required in BCIA's February 24, 2012 letter, BRMCLP has sought to exculpate itself from its own illicit and unlawful activities through a charade of denying knowledge of the matter, placing blame on others, and pretending to conduct a legitimate investigation the matter.

144.    Specifically, BRMCLP sent a letter to BRMC, dated March 7, 2012, in which BRMCLP conceded that the unlawful and illicit activities pertaining to the elevators in building 11 had in fact occurred; however, BRMCLP (i) falsely and disingenuously denied any involvement in those activities; (ii) falsely and disingenuously sought to portray those activities as the independent actions of Glaski, Current Elevator and US Elevator; and (iii) indicated that it is conducting an investigation into the matter in a transparent effort to further conceal its involvement in those activities. (A copy of the March 7, 2012 letter from BRMCLP to BCIA is attached hereto as *Exhibit 6*).

3182483.4

**D.**     **The Need For An Accounting With Respect To All Capital Expenditures Paid For By BCIA Since 2005**

145.     Based upon the foregoing, BCIA suspects that it is likely that additional, undiscovered fraud or similar abuses have occurred in connection with other capital expenditures at the Medical Center that were paid for by BCIA.

146.     Consequently, BRMCLP should be compelled to provide BCIA with a detailed accounting of all transactions relating to all capital expenditures at the Medical Center that have been paid for by BCIA since January 1, 2005.

## COUNT I
### (Breach of Fiduciary Duty)

147.     BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth at length herein.

148.     Defendants BRMCLP and Solomon owe BCIA a fiduciary duty which, at a minimum, requires them to provide BCIA with any and all information and documents relating to or arising out of the Medical Center and/or BCIA's DHSS License.

149.     Through the afore-described conduct, Defendants BRMCLP and Solomon have breached their fiduciary duties to BCIA.

150.     As a direct and proximate result of such breaches, BCIA has sustained and will continue to sustain irreparable harm.

## COUNT II
### (Breach of Contract)

151.     BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth at length herein.

152.     The LOA requires BRMCLP and Solomon to (i) disclose to BCIA financial information, including, but not limited to, audited financial statements consistent with GAAP;

3182483.4

and (ii) provide BCIA with access to various information, records, documents and contracts pertaining to the Medical Center and the DHSS License.

153.     Through the afore-described conduct, Defendants BRMCLP and Solomon have breached the LOA.

154.     As a direct and proximate result of such breach, BCIA has sustained and will continue to sustain irreparable harm.

**COUNT III**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

155.     BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth at length herein.

156.     Every contract contains the implied covenant of good faith and fair dealing that the parties will not do anything that will inure the other party's right to receive the fruits of the contract.

157.     Through the afore-described conduct, Defendants BRMCLP and Solomon have breached the implied covenant of good faith and fair dealing.

158.     As a direct and proximate result of such breach, BCIA has sustained and will continue to sustain irreparable harm.

**COUNT IV**
**(Violation of the Common Law Right of Access)**

159.     BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

160.     By contracting with a governmental authority to serve as its agent with respect to the management of the Medical Center, BRMCLP and Solomon implicitly agreed to be bound by same public disclosure obligations that would apply to BCIA as it relates to the

3182483.4

Medical Center, including, but not limited to, the obligations under the Common Law Right of Access.

161.    Through the afore-described conduct, Defendants BRMCLP and Solomon have violated of the Common Law Right of Access in derogation of the principles set forth in *Bergen County Improvement Authority v. North Jersey Media Group and Bergen Regional Medical Center, L.P.*, 370 N.J. Super. 504 (App. Div. 2004).

162.    As a direct and proximate result of such violation, BCIA has sustained and will continue to sustain irreparable harm.

## COUNT V
### (Conspiracy)

163.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

164.    The afore-described acts of the Conspirator Defendants were undertaken willfully and maliciously in furtherance of a common plan and conspiracy to accomplish the unlawful and illicit objectives set forth above.

165.    The afore-described acts of the Conspirator Defendants were formulated, orchestrated and implemented by the Conspirator Defendants in furtherance of the conspiracy, and were undertaken by them willfully and maliciously, in bad faith, and for the purposes of defrauding BCIA in connection with the Elevator Project and concealing their unlawful and illicit activities.

166.    As a direct and proximate result of such conduct, BCIA has sustained and will continue to sustain damages.

3182483.4

## COUNT VI
### (Fraud)

167.   BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

168.   Through the submission of the afore-described documentation, BRMCLP willfully and maliciously misrepresented to BCIA: (i) that the afore-described services and equipment, which had never been provided, had in fact been provided; or (ii) that the afore-described services and equipment, which had already been paid for, had in fact not been paid for.

169.   BRMCLP made the foregoing misrepresentations intentionally and deliberately, with knowledge of their falsity, and with intent induce BCIA into paying BRMCLP for services and equipment that had never been provided or services and equipment that BCIA had already paid for.

170.   BCIA relied upon the foregoing misrepresentations in authorizing the afore-described payments that were made to BRMCLP.

171.   As a direct and proximate result of the foregoing misrepresentations, BCIA has sustained and will continue to sustain damages.

## COUNT VII
### (Fraudulent Concealment)

172.   BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

173.   Defendant BRMCLP owed BCIA a duty to disclose to BCIA all material facts relating to the Elevator Project.

3182483.4

174.    Through the afore-described conduct, BRMCLP intentionally concealed the fact that BRMCLP had engaged in double-billing and the fact that services and equipment that BCIA had paid for were never provided.

175.    BCIA relied upon absence of the forgoing material information to its detriment and, as a consequence, sustained damages.

## COUNT VIII
### (Breach of Fiduciary Duty – Elevator Project)

176.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

177.    Defendant BRMCLP owes BCIA a fiduciary duty which it to act in the best interests of BCIA and, at a minimum, requires BRMCLP to refrain from inducing BCIA to pay BRMCLP for services and equipment that were never provided or services and equipment that had already been paid for.

178.    Through the afore-described conduct, BRMCLP has breached its fiduciary duty to BCIA and has caused BCIA to sustain and will continue to sustain damages.

## COUNT IX
### (Breach Fiduciary Duty – Hynes and Rudolph)

179.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

180.    While employed as Assistant to the  Executive Director of BCIA, Hynes owed BCIA a fiduciary duty which required him to act in the best interests of BCIA at all times.

181.    While employed as Assistant to the  Executive Director of BCIA, Rudolph owed BCIA a fiduciary duty which required him to act in the best interests of BCIA at all times.

44

3182483.4

182.    As Executive Director and Assistant to the Executive Director of BCIA, Hynes and Rudolph were responsible for oversight of the Medical Center and BRMCLP, which included, among other things, oversight of the capital improvements performed (through BRMCLP) at the Medical Center (and paid for by BCIA and Bergen County) and, more specifically, to ensure that payments made to BRMCLP for capital improvements were appropriate.

183.    Hynes and Rudolph breached -- willfully and maliciously -- their fiduciary duties to BCIA by, among other things, executing false and misleading certifications that induced BCIA to pay BRMCLP for services and equipment that had never been provided or had already been paid for, and by failing to implement appropriate procedures and/or internal controls designed to detect double billing by BRMCLP and/or otherwise prevent BCIA from paying for services and equipment that either had not been provided or had already been paid for.

184.    As a direct and proximate result of such conduct, BCIA has sustained and will continue to sustain damages.

## COUNT X
### (Breach of Contract – Hynes)

185.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

186.    On January 27, 2003, Hynes and BCIA entered into an Employment Agreement pursuant to which Hynes was hired as the Executive Director of BCIA  The January 27, 2003 Employment Agreement, as amended in 2006, provides that Hynes shall be responsible for, among other things, "general supervision over the administration of the BCIA's business and affairs[;]" "[r]eview, if necessary, all purchases and, in general, do and perform all acts and

3182483.4

things incident to the management thereof including the making of all disbursements thereof;" and perform such other duties as are necessary for the proper administration of the BCIA."

187.    Through the afore-described conduct, Hynes has breached -- willfully and maliciously -- the January 27, 2003 Employment Agreement, as amended in 2006.

188.    As a direct and proximate result of such breach, BCIA has sustained and will continue to sustain damages.

## COUNT XI
### (Breach of Contract – Rudolph)

189.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

190.    On February 6, 2007, Rudolph and BCIA entered into an Employment Agreement pursuant to which Rudolph was hired as the Assistant to Executive Director of BCIA. The February 6, 2007 Employment Agreement provides, among other things, that Rudolph is responsible for "general supervision over the administration of the BCIA's business and affairs, subject to the direction of the Commissioners and Executive Director."

191.    Through the afore-described conduct, Rudolph has breached -- willfully and maliciously -- the February 6, 2007 Employment Agreement.

192.    As a direct and proximate result of such breach, BCIA has sustained and will continue to sustain damages.

## COUNT XII
### (Aiding and Abetting)

193.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

3182483.4

194.    Through the afore-described conduct, Defendants Lindenbaum, Sebbag, US Elevator, John Does 1-100 and ABC Companies 1-100, assisted and actively aided and abetted the afore-described unlawful and illicit activities of BRMCLP, Glaski and Current Elevator.

195.    As a direct and proximate result of such conduct, BCIA has sustained and continues to sustain damages.

### COUNT XIII
### (Breach of Contract – Elevator Project)

196.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

197.    Under the LOA, BCIA is responsible for paying for required capital improvements at the Medical Center and Defendants BRMCLP and Solomon are, at the discretion of BCIA, required to properly oversee and administer such capital improvements.

198.    At BCIA's direction, Defendants BRMCLP and Solomon agreed to oversee the Elevator Project.

199.    Through the afore-described conduct, Defendant Solomon and BRMCLP breached their obligations under the LOA.

200.    As a direct and proximate result of such breach, BCIA has sustained and will continue to sustain damages.

### COUNT XIV

### (Breach of Implied Covenant of Good Faith and Fair Dealing – Elevator Project)

201.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

47

3182483.4

202.    Under the LOA, BCIA is responsible for paying for required capital improvements at the Medical Center and Defendants BRMCLP and Solomon are, at the discretion of BCIA, required to properly oversee and administer such capital improvements.

203.    At BCIA's direction, Defendants BRMCLP and Solomon agreed to oversee the Elevator Project.

204.    Every contract contains the implied covenant of good faith and fair dealing that the parties will not do anything that will inure the other party's right to receive the fruits of the contract.

205.    Through the afore-described conduct, Defendant BRMCLP breached the implied covenant of good faith and fair dealing.

206.    As a direct and proximate result of such breach, BCIA has sustained and will continue to sustain damages.

## COUNT XV
### (Unjust Enrichment)

207.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

208.    Through the afore-described conduct, Defendants BRMCLP and Current Elevator have been improperly and unjustly enriched at the expense of and to the detriment of BCIA.

209.    As a direct and proximate result of such unjust enrichment, BCIA has sustained and will continue to sustain damages.

3182483.4

## COUNT XVI
### (Accounting)

210.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

211.    As noted, based upon the afore-described illicit and unlawful conduct with respect to the Elevator Project, BCIA suspects that it is likely that additional, undiscovered fraud or similar abuses have occurred in connection with other capital expenditures at the Medical Center that were paid for by BCIA.

212.    Consequently, BRMCLP should be compelled to provide BCIA with a detailed accounting of all transactions relating to all capital expenditures at the Medical Center that have been paid for by BCIA since January 1, 2005.

## COUNT XVII
### (Sett-Off)

213.    BCIA repeats and realleges the allegations contained in each of the preceding paragraphs as is fully set forth at length herein.

214.    BRMCLP owes BCIA hundreds of thousands of dollars, if not more, as consequence of the afore-described conduct.

215.    To the extent that BCIA owes BRMCLP any monies in connection with any matters unrelated to the Elevator Project, that amount should be set-off and reduced by the amount of money that BRMCLP owes BCIA as a consequence of the afore-described conduct.

WHEREFORE, BCIA demands judgment against Defendants as follows:

As to Defendants BRMCLP, Solomon, Global, iCare, SHG, LSS, International, Bergen Regional Anesthesiology Group, Bergen Regional Radiology Associates, John Does 1-100 and ABC Companies 1-100:

A.    For an Order compelling Defendants to provide BCIA with all the Supplemental Medical Center Information within their knowledge, possession or control;

3182483.4

As to Defendants BRMCLP, Current Elevator, Glaski, Lindenbaum, Sebbag, US Elevator, Hynes, Rudolph, John Does 1-100 and ABC Companies 1-100:

B.    For punitive damages;

C.    For compensatory damages;

D.    For any and all relief permitted by contract, statutory law, common law and equity, relating to the afore-described illicit and unlawful conduct, including, but not limited to, termination of the LOA;

E.    Compelling BRMCLP to provide BCIA with a detailed accounting of all transactions relating to all capital expenditures at the Medical Center that have been paid for by BCIA since January 1, 2005;

F.    Adjudicating and declaring that to the extent that BCIA owes BRMCLP any monies in connection with any matters unrelated to the Elevator Project, that amount should be set-off and reduced by the amount of money that BRMCLP owes BCIA as a consequence of the afore-described conduct;

As to Defendants Hynes, Rudolph, John Does 1-100 and ABC Companies 1-100:

G.    For punitive damages;

H.    For compensatory damages;

I.    For disgorgement of compensation paid by BCIA during the relevant period;

As to all Defendants:

J.    For interest;

K.    For costs of suit and attorneys' fees; and

L.    For such other and further relief that the Court may deem just and equitable.

50

3182483.4

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable herein.

## DESIGNATION OF TRIAL COUNSEL

Arthur S. Goldstein is hereby designated as trial counsel on behalf of Plaintiff BCIA in this matter.

WOLFF & SAMSON PC
Attorneys for Plaintiff
Bergen County Improvement
Authority


By s/ Arthur S. Goldstein_____
ARTHUR S. GOLDSTEIN

Dated: March 28, 2012

## CERTIFICATION

I hereby certify that the matter in controversy is not the subject of any other court or arbitration proceeding. Nor is any other court or arbitration proceeding contemplated. I know of no other parties who should be joined at this time. However, Plaintiff's investigation into this matter is ongoing and, therefore, may result in the inclusion of additional parties in the future.

s/ Arthur S. Goldstein_____
ARTHUR S. GOLDSTEIN

Dated: March 28, 2012

51

3182483.4